Kathleen S. O'Neill (PA Bar No. 82785)
Joseph Chandra Mazumdar (WI Bar No. 1030967)
Brian E. Hanna (VA Bar No. 80439)
Robert A. Lepore (AZ Bar No. 028137)
Tai Milder (CABN 267070)
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 8000
Washington, DC  20530
Telephone: (202) 307-2931
Fax: (202) 307-2874
Email: kathleen.oneill@usdoj.gov

Brian J. Stretch (CABN 163973)
United States Attorney
[Additional counsel listed on signature page]

Attorneys for Plaintiff United States of America

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>     v.<br><br>VA PARTNERS I, LLC<br>VALUEACT CAPITAL MASTER FUND, L.P.<br>VALUEACT CO-INVEST INTERNATIONAL, L.P.,<br><br>              Defendants. | Civil Action No.: |

## **COMPLAINT**

The United States of America, acting under the direction of the Attorney General of the United States, brings this civil action to obtain civil penalties and equitable relief against the Defendants (collectively, "ValueAct") for failing to comply with the premerger notification and waiting period requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), and alleges as follows:

## I.   <u>INTRODUCTION</u>

1.       The Hart-Scott-Rodino Act, 15 U.S.C. §18a, is an essential part of modern antitrust enforcement.  It requires purchasers of voting securities in excess of a certain value to notify the Department of Justice and the Federal Trade Commission and to observe a waiting period before consummating the transaction.  These obligations extend to acquisitions of minority interests.  One limited exemption to these obligations applies if the purchaser's holdings constitute less than ten percent of the stock of the company and the acquisition is "solely for the purpose of investment" – that is, the purchaser has no intention of participating in the company's business decisions.

2.       ValueAct promotes itself as having a strategy of "active, constructive involvement" in the management of the companies in which it invests.  This case concerns recent acquisitions by two ValueAct investment funds of over $2.5 billion of voting securities of Halliburton Company and Baker Hughes Incorporated.  Halliburton and Baker Hughes are head-to-head competitors and two of the largest providers of oilfield products and services in the world.  On November 17, 2014, Halliburton and Baker Hughes announced their intent to merge.  Their proposed merger is the subject of an ongoing antitrust review in the United States and several other countries.

3.       ValueAct began acquiring significant holdings of the two companies on the heels of the Halliburton/Baker Hughes merger announcement.  From the beginning, ValueAct anticipated influencing the business decisions of the companies as the merger process unfolded.  ValueAct sent memoranda to its investors outlining this strategy and explaining that purchasing a stake in each of these firms would allow it to "be a strong advocate for the deal to close," which would in turn "[i]ncrease probability of deal happening."  If the deal encountered "regulatory issues," ValueAct "would be well positioned as an owner of both companies to help develop the new terms."  ValueAct executives also discussed internally a back-up plan to "sell at least some of Baker's pieces" if the deal were blocked or abandoned.

4.       ValueAct's purchases of Halliburton and Baker Hughes shares did not qualify for the narrow exemption from the requirements of the HSR Act for acquisitions made solely for the

1 purpose of investment.  ValueAct planned from the outset to take steps to influence the business

2 decisions of both companies, and met frequently with executives of both companies to execute

3 those plans.

4       5.      These HSR Act violations allowed ValueAct to become one of the largest

5 shareholders of both Halliburton and Baker Hughes, without providing the government its

6 statutory right to notice and prior review of the stock purchases.  ValueAct established these

7 positions as Halliburton and Baker Hughes were being investigated for agreeing to a merger that

8 threatens to substantially lessen competition in numerous markets.  ValueAct intended to use its

9 position as a major shareholder of these companies to obtain access to management, to learn

10 information about the merger and the companies' strategies in private conversations with senior

11 executives, to influence those executives to improve the chances that the merger would be

12 completed, and to influence other business decisions whether or not the merger went forward.

13       6.      The Court should assess a civil penalty of at least $19 million to address

14 ValueAct's violations of the HSR Act, and should restrain ValueAct from further violations.

## II.   JURISDICTION AND VENUE

16       7.      This Complaint is filed and these proceedings are instituted under Section 7A of

17 the Clayton Act, 15 U.S.C. § 18a, added by Title II of the HSR Act, to recover civil penalties and

18 equitable relief for violations of that section.

19       8.      This Court has jurisdiction over the Defendants and over the subject matter of this

20 action pursuant to Section 7A(g) of the Clayton Act, 15 U.S.C. § 18a(g), and pursuant to

21 28 U.S.C. §§ 1331, 1337(a), 1345 and 1355.  Each of the Defendants is engaged in commerce, or

22 in activities affecting commerce, within the meaning of Section 1 of the Clayton Act, 15 U.S.C.

23 § 12, and Section 7A(a)(1) of the Clayton Act, 15 U.S.C. § 18a(a)(1).

24       9.      Venue is properly based in this District under Section 12 of the Clayton Act, 15

25 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2), (c)(2).  Each of the Defendants transacts or has

26 transacted business in this district and has its principal place of business here.

27 ///

28 ///

### III.   INTRADISTRICT ASSIGNMENT

10.     Assignment to the San Francisco Division is proper because this action arose primarily in San Francisco County.  Many of the events that gave rise to the claims occurred in San Francisco, and Defendants' headquarters and principal places of business were during the relevant events, and continue to be, located in San Francisco.

### IV.   THE DEFENDANTS

11.     This case arises from acquisitions of stock over several months by two investment funds – ValueAct Master Capital Fund, L.P. ("Master Fund") and ValueAct Co-Invest International, L.P. ("Co-Invest Fund").  Though separate entities for purposes of the HSR Act, both funds have the same general partner – VA Partners I, LLC ("VA Partners").  Master Fund and Co-Invest Fund are organized under the laws of the British Virgin Islands, and VA Partners is organized under the laws of Delaware.  Master Fund, Co-Invest Fund, and VA Partners (collectively, "ValueAct" or "Defendants") all have the same principal office and place of business in San Francisco, California.

12.     ValueAct is well known as an activist investor.  In contrast to other large funds that focus on passive investment strategies to generate returns, ValueAct's website explains that it pursues a strategy of "active, constructive involvement" in the management of the companies in which it invests.  The website further states, "The goal in each investment is to work constructively with management and/or the company's board to implement a strategy or strategies that maximize returns for all shareholders."

13.     ValueAct tracks its "activism" in these investments by various metrics, such as success in changing executive compensation, and touts these statistics in its presentations to potential investors as illustrated by the following slide from ValueAct's June 2015 presentation:

///
///
///
///
///

Complaint - 4

ValueAct Capital Submission in Response to Second Request issued on 1/27/2016 and 2/10/2016 - Business Confidential - Confidential Treatment Requested

## ABILITY TO INFLUENCE: OUR "ACTIVISM" SCORECARD

| | |
|---|---|
| Total Core Investments | 79 |
| Public Board Seats | 41 |
| Proxy Contest* | 1 |
| CEO/CFO Changes | 33 |
| Major Divestitures | 14 |
| Recaps/Big Share Repurchases | 26 |
| Operating Consultant Engagements | 14 |
| Acquisition/Investment Strategy | 11 |
| Company Sales | 19 |
| Compensation Changes | 9 |

*Settled before vote

22

14.     In presentations, ValueAct has explained that it likes "disciplined oligopolies" and looks to invest in businesses in "[o]ligopolistic markets, high barriers-to-entry."

15.     ValueAct funds have previously violated the HSR Act by acquiring voting securities without making the required notifications.  In 2003, ValueAct Capital Partners, L.P. filed corrective notifications for three prior acquisitions of voting securities.  ValueAct outlined steps it would take to ensure future compliance with the HSR Act.  No enforcement action was taken at that time.  Master Fund then failed to make required filings with respect to three acquisitions that it made in 2005.  ValueAct agreed to pay a $1.1 million civil penalty to settle an HSR Act enforcement action based on these violations.

## V.     BACKGROUND

### A.     The Hart-Scott-Rodino Antitrust Improvements Act

16.     The HSR Act requires parties to file a notification with the Federal Trade Commission and the Department of Justice and to observe a waiting period before consummating acquisitions of voting securities or assets that exceed certain value thresholds.

These requirements give the antitrust enforcement agencies prior notice of, and information about, proposed transactions.  The waiting period also provides the antitrust enforcement agencies with an opportunity to investigate and to seek an injunction to prevent the consummation of anticompetitive transactions.

17.     The HSR Act contains certain limited exemptions to the notification and waiting period requirements.  The acquirer of voting securities has the burden of showing eligibility for an exemption.  One such exemption applies narrowly to acquisitions made "solely for the purpose of investment" if the voting securities held do not exceed ten percent of the outstanding voting securities of the issuer.  15 U.S.C. § 18a(c)(9).  The regulations implementing the Act explain that, to qualify for this exemption, the acquiring party must have "no intention of participating in the formulation, determination, or direction of the basic business decisions of the issuer."  16 C.F.R. § 801.1(i)(1).

**B.      ValueAct's Initial Investment Decision and Strategy**

18.     After Halliburton and Baker Hughes announced their intent to merge on November 17, 2014, ValueAct began purchasing stock in each company through its Master Fund and Co-Invest Fund.  ValueAct continued to make purchases in both companies for several months, eventually acquiring over $2.5 billion in securities of the two companies combined.

19.     As ValueAct was acquiring stock in these two companies in December 2014 and early January 2015, its executives were developing strategies to use ValueAct's ownership position to influence management of each firm as necessary to increase the probability of the deal being completed.  ValueAct's Master Fund crossed the applicable HSR Act reporting thresholds for Baker Hughes and Halliburton on December 1 and December 5, 2014, respectively, and Master Fund continued to build up its position as its executives discussed strategy.  These discussions culminated in the drafting of memoranda that ValueAct sent to its investors on January 16, 2015.  These memoranda – one about Baker Hughes and one about Halliburton – explained ValueAct's decision to acquire stakes in these competitors through its Master Fund, and offered investors the opportunity to increase their stakes in these firms through additional share purchases by ValueAct's Co-Invest Fund.

Complaint - 6

20.     These memoranda and other contemporaneous documents show that ValueAct's most senior executives planned from the outset to play an active role at Halliburton and Baker Hughes.  The lead ValueAct partner responsible for the Baker Hughes investment internally circulated a draft of an investor memorandum explaining that "our activist approach limits our downside in the unlikely case that the merger does not close."  The draft further noted that if the merger were not completed, ValueAct "would likely seek to take a more active role in overseeing the company."  ValueAct's CEO then requested an insertion into the memorandum highlighting that ValueAct's "[a]ctive role" is an additional reason to invest in both companies.

21.     Although the memoranda ultimately shared with investors watered down the words used to describe ValueAct's activist strategy, they still emphasized that purchasing a stake in Halliburton and Baker Hughes would "increase probability of deal happening" and would allow ValueAct to be "a strong advocate for the deal to close."  ValueAct identified this as one of three "key considerations" supporting its investment decision.  A contemporaneous email among ValueAct partners remarked that if Halliburton's shareholders threatened to vote against the deal, ValueAct's "position in HAL should be meaningful enough to have a substantial role in those conversations."

22.     ValueAct also intended to help restructure the merger if it hit roadblocks.  On December 16, 2014, ValueAct's CEO emailed his partners:  "if we own both we can drive new terms to get the deal done if weird [expletive] is happening."  ValueAct also expressed this view in its memos to investors:  "In the event of further fundamental dislocation or regulatory issues, it is possible the deal would need to be restructured and we believe ValueAct Capital would be well positioned as an owner of both companies to help develop the new terms."

23.     In a December 2014 internal email, a ValueAct partner observed that "[i]f the deal failed, the back-up plan would seem to be to sell at least some of Baker's pieces, and we think that we could get up to 12x EBITDA for just 2 of BHI's businesses – artificial lift and chemicals."  ValueAct's memoranda to investors noted, "Recent transactions in each of those industries [specialty chemicals and artificial lift] suggest that these businesses are worth north of 10 times EBITDA."  Moreover, the Baker Hughes memorandum explained that there are

"numerous levers for the company to pull to drive margin expansion," and identified Baker Hughes's pressure pumping business as a good candidate for margin improvement.

24. Regardless of how the merger process unfolded, ValueAct intended to influence the business decisions of both companies. For example, on December 5, 2014, the day Master Fund's holdings in Halliburton crossed the HSR Act threshold, a ValueAct partner wrote an email to ValueAct's CEO about Halliburton: "Wonder if it would be possible to get the VRX [Valeant Pharmaceuticals] comp plan in from outside the board room?" The CEO responded "Yes. Good idea." (ValueAct had recently convinced management to change the executive compensation plan at another of its investments, Valeant Pharmaceuticals.)

25. ValueAct also intended to play a role in Halliburton's efforts to integrate the two firms. ValueAct told its investors that its stake in Halliburton "helps to further enhance our relationship with management and the board of directors as they work to complete the merger and integrate the business into Halliburton's existing operations."

**C.  ValueAct's Efforts to Influence the Management of Both Companies**

26. Consistent with its investment strategy of "active, constructive involvement," ValueAct established a direct line to senior management at both Halliburton and Baker Hughes and met with them frequently from the time it started acquiring stock. From December 2014 through January 2016, ValueAct met in person or had teleconferences more than fifteen times with senior management of Halliburton or Baker Hughes, including meeting multiple times with the CEOs of both companies. ValueAct partners also exchanged a number of emails with management at both firms about the merger and the companies' respective operations.

27. ValueAct reached out to Baker Hughes immediately after it began purchasing shares. On December 1, 2014, the day Master Fund's holdings crossed the HSR Act threshold for Baker Hughes, a ValueAct partner told a Baker Hughes executive that ValueAct was positive on the merger but also liked "that 20% of [Baker Hughes's] revenue comes from non-capital intensive business lines which could command a big multiple if sold." A few days later, ValueAct's CEO met in person with the CFO of Baker Hughes. According to Baker Hughes's notes of the meeting, ValueAct's CEO "highlighted that it was critical that BHI continued

focused [*sic*] on many of these improvement opportunities despite the acquisition.  He specifically emphasized with graphs the largest gap/opportunities he saw."  With respect to the gap in Baker Hughes's North American margins, ValueAct's CEO stated, "Looking to learn with BHI on how to close that GAP [*sic*]."  ValueAct's CEO also discussed other areas "that he thought BHI should continue to focus on as there was a lot of improvement opportunity."  According to the notes, the meeting ended with ValueAct's CEO "stating that they would remain in contact and sharing that they plan to be large shareholders of BHI."

28.     On January 16, 2015, ValueAct filed a Beneficial Ownership Report (Schedule 13D) with the Securities and Exchange Commission publicly disclosing its substantial stake in Baker Hughes and reporting that it might discuss "competitive and strategic matters" with Baker Hughes management, and might "propos[e] changes in [Baker Hughes's] operations."  Before submitting the Schedule 13D, ValueAct's CEO notified Halliburton's CEO of the impending filing on Baker Hughes, explaining that the filing "gives us the flexibility to engage with the company [Baker Hughes] on all issues."  Later the same day, ValueAct's CEO emailed Halliburton's CEO a copy of its investment memoranda for both Halliburton and Baker Hughes.

29.     By February, after ValueAct had completed its outreach to investors seeking capital for additional share purchases, ValueAct began acquiring stock in Halliburton and Baker Hughes through Co-Invest Fund.  On March 10, 2015, Co-Invest Fund's holdings in Halliburton crossed the applicable HSR Act reporting threshold.

30.     Also in early March, ValueAct contacted Halliburton to offer assistance in advance of the shareholder vote on the merger.  ValueAct offered Halliburton "to speak with any of [Halliburton's] top shareholders about [ValueAct's] view of the merger prior to the vote."  Halliburton responded that it would let ValueAct know if ValueAct's help became necessary.

31.     In May 2015, ValueAct further engaged with Halliburton on the company's plans for post-merger integration.  On May 13, ValueAct met with Halliburton's CEO to discuss actions that Halliburton could take in an attempt to achieve its target merger synergies.  On May 27, a ValueAct partner called Halliburton's Chief Integration Officer to recommend a firm

for real estate integration services.  In a subsequent email exchange, another ValueAct partner emphasized the need to engage on these issues at the executive level, and stated that Halliburton's plan was "a traditional approach likely to leave value on the table."  Instead, the partner identified alternative ways the real estate firm could work with Halliburton to help achieve the synergy goals.

32.     ValueAct also followed through on its idea for changing Halliburton's executive compensation plan.  On July 14, 2015, ValueAct contacted Halliburton's CEO to schedule a meeting to discuss executive compensation.  At the meeting, which ultimately occurred in September, ValueAct delivered a thirty-five-page presentation detailing ValueAct's preferred approach, commenting on Halliburton's current plan, and proposing specific changes.

**D.      Consistent with Its Initial Plans, ValueAct Worked to Restructure the Merger or to Sell Parts of Baker Hughes**

33.     ValueAct carefully monitored the status of the antitrust review process and intended to intervene with the management of each firm as necessary to increase the probability of the deal being completed.  ValueAct met with Baker Hughes's CEO in May 2015 and according to ValueAct's notes of that meeting, Baker Hughes's CEO "seemed pretty worried about anti-trust, and implied odds deal goes through 70% or lower in his mind."  ValueAct then continued to push management of both companies to preserve the deal or, if these efforts failed, to sell off pieces of Baker Hughes.

34.     On August 31, 2015, ValueAct met with Baker Hughes's CEO "to plant the seed to seek alternative options with other buyers if the deal falls through."  In its initial investment analysis, the ValueAct partners had discussed selling individual Baker Hughes businesses as a back-up plan if the merger failed.  ValueAct presented an updated analysis to argue this case to Baker Hughes.  ValueAct also proposed restructuring the deal with Halliburton, suggesting that Baker Hughes should sell its pressure pumping, artificial lift, and specialty chemical businesses to Halliburton at a premium in lieu of receiving the merger termination fee.

35.     According to ValueAct notes from the meeting, Baker Hughes's CEO was "very committed to running BHI stand-alone if the deal fails and did not seem to entertain the idea of

shopping the business piecemeal to other buyers." The notes explain that ValueAct agreed that the Baker Hughes CEO's plan to "focus on technology-based product lines, and grow the business organically in these areas seems like the right areas to focus for the stand-alone company." But this plan was not what the ValueAct executives hoped for: "the problem is that this story seems like a 4-5 year period with the stock not generating a great return over that period." According to Baker Hughes's notes of the meeting, the ValueAct executives registered disappointment with Baker Hughes's CEO, and informed him that Halliburton and Baker Hughes were "the only investment ValueAct had where they did not have board seats."

36.    On September 18, 2015, ValueAct pitched its restructuring plan to Halliburton's CEO, advocating that Halliburton pursue selective acquisitions of Baker Hughes's production chemicals and artificial lift businesses. According to Halliburton's notes of the call, ValueAct suggested that Halliburton should offer a substantial sum to acquire these businesses and settle the $3.5 billion merger break-up fee at the same time.

37.    During this conversation with the CEO of Halliburton, ValueAct shared Baker Hughes's plans if the merger could not close. According to Halliburton's notes of the call, ValueAct stated that if the merger could not be consummated, Baker Hughes's CEO intended to "run the company like he did before." Halliburton's CEO then asked whether Baker Hughes's CEO was "listening to VA." A ValueAct partner replied that Baker Hughes's CEO "realize [*sic*] can go to his board directly." ValueAct also asked Halliburton's CEO if there was "anything we [ValueAct] can do to be helpful," and explicitly offered to "apply pressure to BHI CEO regarding unhappiness if he continues to run co. if deal does not go through." In short, ValueAct offered to use its position as a shareholder to pressure Baker Hughes's management to change its business strategy in ways that could affect Baker Hughes's competitive future.

38.    ValueAct and Halliburton's willingness to discuss the competitive future of Baker Hughes in the absence of a merger is further confirmed by notes contained in ValueAct's files. These notes list "3 options that Lazard [presumably Halliburton's CEO, David Lesar] discussed" with respect to Baker Hughes. One of those options was "Cripple a competitor."

39.     On November 5, 2015, ValueAct made a detailed fifty-five page presentation to Baker Hughes's CEO proposing operational and strategic changes to the company.  The same day, ValueAct lobbied Halliburton's senior management to pursue alternative ways to get the deal done.

## VI.    VIOLATIONS ALLEGED

40.     Plaintiff alleges and incorporates paragraphs 1 through 39 as if set forth fully herein.

41.     The HSR Act provides that any person, or any officer, director, or partner thereof, who fails to comply with any provision of the HSR Act is liable to the United States for a civil penalty for each day during which such person is in violation.  Master Fund and Co-Invest Fund are each considered a separate person under the Act and are each obligated to comply with its requirements.

### A.    Count 1: Master Fund's Acquisition of Halliburton

42.     The HSR Act and applicable implementing regulations required that Master Fund file a notification and report form with the antitrust enforcement agencies and observe a waiting period before acquiring any voting securities in Halliburton that would result in Master Fund holding an aggregate total amount of voting securities in excess of the $50 million threshold, as adjusted ($75.9 million in December 2015, and $76.3 million beginning in February 2016).

43.     On or about December 4, 2014, Master Fund began purchasing Halliburton voting securities.  On or about December 5, 2014, Master Fund's aggregate value of Halliburton voting securities exceeded the $75.9 million threshold.  Master Fund continued to purchase Halliburton voting securities until June 30, 2015, by which time Master Fund's aggregate value of Halliburton voting securities exceeded $1.4 billion.

44.     Master Fund failed to file the required notification or to observe the required waiting period.

45.     On or about January 27, 2016, Master Fund had sold a sufficient quantity of voting securities of Halliburton such that its holdings were no longer in excess of $76.3 million.

46.     Master Fund was in violation of the requirements of the HSR Act related to its purchase of Halliburton voting securities each day beginning December 5, 2014, and ending on or about January 27, 2016.

**B.     Count 2: Co-Invest Fund's Acquisition of Halliburton**

47.     The HSR Act and applicable implementing regulations required that Co-Invest Fund file a notification and report form with the antitrust enforcement agencies and observe a waiting period before acquiring any voting securities in Halliburton that would result in Co-Invest Fund holding an aggregate total amount of voting securities in excess of the $50 million threshold, as adjusted ($76.3 million beginning in February 2016).

48.     On or about February 24, 2015, Co-Invest Fund began purchasing Halliburton voting securities.  On or about March 10, 2015, Co-Invest Fund's aggregate value of Halliburton voting securities exceeded the $76.3 million threshold.  Co-Invest Fund continued to purchase Halliburton voting securities until March 12, 2015, by which time Co-Invest Fund's aggregate value of Halliburton voting securities exceeded $138 million.

49.     Co-Invest Fund failed to file the required notification or observe the required waiting period.

50.     On or about January 22, 2016, Co-Invest Fund had sold a sufficient quantity of voting securities of Halliburton such that its holdings were no longer in excess of $76.3 million.

51.     Co-Invest Fund was in violation of the requirements of the HSR Act related to its purchase of Halliburton voting securities each day beginning March 10, 2015, and ending on or about January 22, 2016.

**C.     Count 3: Master Fund's Acquisition of Baker Hughes**

52.     The HSR Act and applicable implementing regulations required that Master Fund file a notification and report form with the antitrust enforcement agencies and observe a waiting period before acquiring any voting securities in Baker Hughes that would result in Master Fund holding an aggregate total amount of voting securities in excess of the $50 million threshold, as adjusted ($75.9 million in December 2015, and $76.3 million beginning in February 2016).

53.     On or about November 28, 2014, Master Fund began purchasing Baker Hughes voting securities.  On or about December 1, 2014, Master Fund's aggregate value of Baker Hughes voting securities exceeded the $75.9 million threshold.  Master Fund continued to purchase Baker Hughes voting securities until January 15, 2015, by which time Master Fund's aggregate value of Baker Hughes voting securities exceeded $1.2 billion.

54.     Master Fund failed to file the required notification or to observe the required waiting period.

55.     Master Fund was in violation of the requirements of the HSR Act related to its purchase of Baker Hughes voting securities each day beginning on December 1, 2014, and remains in violation of the HSR Act to the present.

## VII.     REQUEST FOR RELIEF

Wherefore, Plaintiff requests:

(a)     That the Court adjudge and decree that Defendant Master Fund's acquisitions of voting securities of Halliburton, without having filed a notification and report form and observing a waiting period, violated the HSR Act;

(b)     That the Court adjudge and decree that Defendant Co-Invest Fund's acquisitions of voting securities of Halliburton, without having filed a notification and report form and observing a waiting period, violated the HSR Act;

(c)     That the Court adjudge and decree that Defendant Master Fund's acquisitions of voting securities of Baker Hughes, without having filed a notification and report form and observing a waiting period, violated the HSR Act;

(d)     That the Court order Defendants to pay to the United States an appropriate civil penalty as provided by the HSR Act, 15 U.S.C. § 18a(g)(1), the Debt Collection Improvement Act of 1996, Pub. L. 104-134, § 31001(s) (amending the Federal Civil Penalties Inflation Adjustment Act of 1990, 28 U.S.C. § 2461 note), and Federal Trade Commission Rule 1.98, 16 C.F.R. § 1.98, 74 Fed. Reg. 858 (Jan. 9, 2009);

(e)     That the Court enjoin Defendants from any future violations of the HSR Act;

1       (f)      That the Court order such other and further relief as the Court may deem just and

2  proper; and,

3       (g)     That the Court award the Plaintiff its costs of this suit.

4

5  Dated:

6

7  Respectfully submitted,

8  FOR THE PLAINTIFF UNITED STATES
    OF AMERICA:

9

10

11  WILLIAM J. BAER               JOSEPH CHANDRA MAZUMDAR
    Assistant Attorney General         BRIAN E. HANNA

12                                  TAI MILDER

13                                  Trial Attorneys

14

15  DAVID I. GELFAND
    Deputy Assistant Attorney General    United States Department of Justice
                                  Antitrust Division

16                                  450 Fifth Street, NW

17                                  Suite 8000

18  PATRICIA A. BRINK (CABN 144499)    Washington, DC  20530
    Director of Civil Enforcement          Telephone: (202) 307-2931

19                                  kathleen.oneill@usdoj.gov

20

21  KATHLEEN S. O'NEILL            BRIAN J. STRETCH (CABN 163973)
    Chief, Transportation, Energy, and     United States Attorney

22  Agriculture Section               By JONATHAN U. LEE (CABN 148792)
                                    Acting Chief, Civil Division

23                                  Assistant U.S. Attorney

24                                  Office of the United States Attorney
    ROBERT A. LEPORE               Northern District of California

25  Assistant Chief, Transportation, Energy, and  450 Golden Gate Avenue
    Agriculture Section               San Francisco, CA  94102

26                                  Telephone: (415) 436-7200

27                                  E-mail: jonathan.lee@usdoj.gov

28

Complaint - 15